UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
BERNARD L. SCHWARTZ,

      Plaintiff,

                05 Civ. 7943 (PKC)

    -against-

                MEMORANDUM
TWIN CITY FIRE INSURANCE CO., et al.,     AND ORDER

      Defendants.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

    These are the Court's rulings on the post-trial motions in an action tried to

verdict before a jury on a claim of an insured against his excess carriers under directors' and

officers' liability policies.  Bad faith cross-claims were asserted by the excess carriers against

the settling primary carrier and they are also the subject of post-trial rulings.

I.  OVERVIEW

    Bernard L. Schwartz is a graduate of New York City's Townsend Harris High

School and C.U.N.Y.'s Brooklyn College, a veteran of World War II and a public accountant.

In 1972, he joined Loral Space & Communications Ltd. ("Loral") and later became its chief

executive officer.  In 2003, Loral filed for Chapter 11 protection as a result of its failed

investment in a nascent satellite telephone business known as Globalstar.  Schwartz also had

served as chief executive officer of the Globalstar companies.

    Schwartz became the sole defendant in a certified federal securities class action

arising out of his service with Globalstar.  In his capacity as an officer, he was an insured

under a primary layer of insurance written by Twin City Fire Insurance Co. ("Twin City" or

the "Primary Carrier"), an affiliate of The Hartford.  The primary layer, together with the

excess layers, provided a total of $50 million in coverage.  While there is debate about the

magnitude of Schwartz's damage exposure in the securities class action, it suffices to note that it was potentially in excess of the limits of insurance.  Schwartz had accumulated a net worth of over $300 million, which, in whole or substantial part, was at risk in the securities class action.

Prior to the commencement of the trial of the securities class action, several unsuccessful settlement meetings were held with the assistance of a privately-retained mediator which included Schwartz's counsel, counsel for the class, counsel for Twin City and counsel for other carriers in the excess layers.  At several points in the pre-trial settlement discussions, class counsel expressed a willingness to resolve the case for $15 million.  As of commencement of the securities class action trial, Twin City had not tendered its limits of $10 million and, with the primary limits unexhausted, the excess carriers were unwilling to contribute meaningfully to a settlement.

After the close of the plaintiffs' case in the securities class action, this Court denied in part Schwartz's motion for judgment as a matter of law.  With the trial drawing to a close and no further movement from the primary and excess insurers, Schwartz concluded, over a weekend break, that the most prudent course of action was to settle the case, lest his considerable wealth be exposed to a judgment in excess of all insurance.  His counsel approached class counsel, who, by then, was no longer willing to accept $15 million in settlement.  Schwartz's counsel learned on Saturday, July 16, that the case could be settled for $20 million.  Schwartz's counsel sought consent to settle for that figure from each of the insurers, although there was a dispute at the insurance trial as to precisely when the settlement with class counsel was reached in relation to Schwartz's request for consent.  It was undisputed that on Monday morning, July 18, 2005, Schwartz and class counsel announced in open court that they had reached an agreement-in-principle on a $20 million settlement.  With

no consent from any insurer having been received, Schwartz agreed to fund the settlement from his personal wealth.  Had it not been settled, the case would have been submitted to the jury within two or three days.

The present action was commenced less than a month after Schwartz paid the $20 million settlement.  Schwartz sued Twin City and the carriers on the relevant layers of excess coverage, namely, Royal Indemnity ("Royal"), Liberty Mutual Insurance Company ("Liberty") and North American Specialty Insurance Company ("North American").  Royal, Liberty and North American asserted bad faith cross-claims against co-defendant Twin City.

The trial of the present action began on January 8, 2007.  Several days prior to commencement of trial, Twin City and Royal settled with Schwartz agreeing, among other things, to pay to him 100% of their layers of insurance.

Schwartz's breach of contract claim against Liberty and North American (collectively, the "Excess Carriers") proceeded to verdict and the jury awarded Schwartz $5 million against Liberty and $4,085,723.11 against North American.  The same jury returned verdicts in favor of Liberty in the amount of $2 million and North American in the amount of $3 million on their bad faith cross-claim against Twin City.  Judgment was entered on January 29, 2007.

Following the entry of judgment, Schwartz moved, pursuant to Rule 59(e), Fed. R. Civ. P., to amend the judgment to provide pre-judgment interest on the damage award in favor of plaintiff.  North American, Liberty and Twin City moved for judgment as a matter of law, pursuant to Rule 50(b), Fed. R. Civ. P., or, alternatively, for a new trial pursuant to Rule 59, Fed. R. Civ. P.

The Court concludes that the policies of insurance do not provide a basis for judgment as a matter of law in favor of Liberty or North American and that there was ample evidence to support the jury's verdict.  There is no basis to grant the alternative relief of a new trial.  Schwartz is entitled to pre-judgment interest from the date he made the $20 million payment to class counsel.

New York's requirement that "gross disregard" be proven on the part of the party assertedly acting in bad faith applies to the bad faith cross-claims of North American and Liberty.  Because the jury concluded that Twin City did not act with "gross disregard" of the rights of North American and Liberty, Twin City's motion for judgment as a matter of law is granted.

II.     THE FACTS

To a great extent, the trial of the insurance case presented a trial within a trial. Liberty and North American argued, among other things, that the settlement of the securities class action for $20 million was unreasonable in amount, and, in order for the jury in the insurance trial to evaluate this defense, they needed to understand the claims that had been presented to the jury in the securities trial.

The evidence in the insurance trial established that in the early 1990s, Schwartz and others formed a number of related communications companies, including Globalstar L.P., Globalstar Telecommunications Ltd. ("GTL"), and Globalstar Capital Corp. (collectively, "Globalstar").  Globalstar's satellite phone business failed, and Globalstar's shareholders initiated a class action, (the "Globalstar Class Action"), suing Schwartz and others for allegedly making false statements relating to Globalstar's financial position in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and Sections 11, 12(2)(a) and 15 of the

Securities Act of 1933 (the "1933 Act").  In re Globalstar Securities Litigation, 01 Civ. 1748 (PKC).[1]

On December 15, 2003, a motion to dismiss the securities class action complaint was denied.  (PX 18).  The action proceeded through the discovery process and, on November 12, 2004, the trial judge (who happened to be the undersigned) set a trial date of July 6, 2005.[2] (Docket Entry # 77; see also PX 29 at 3)  The class was certified on December 1, 2004.  (PX 29)

Schwartz, the chief executive officer of Globalstar L.P. and chairman and chief executive officer of GTL, was an insured under a claims-made directors and officers liability policy issued by Twin City to GTL, affording $10 million in aggregate primary coverage, including claims expenses. (PX 1)  Sitting above the primary layer was a tower of $40 million in excess coverage with several different carriers.  Royal held the first excess layer of $5 million (PX 2), followed by North American (PX 3) and then Liberty (PX 4) each at $5 million.  Star Excess Liability Insurance Co., Great American E & S Insurance Co. ("Greenwich") and Greenwich Ins. Co. held the remaining layers of coverage which are not implicated in this action. (PX 5-7)

The carriers monitored the progress of pretrial proceedings and Schwartz's lawyer kept them advised of material developments.  For example, on July 30, 2004, Schwartz's counsel transmitted a letter report which, among other things, reviewed and updated estimates, calculations and predictions of potential damage awards in the class action.

---

[1] The Globalstar entities and co-defendant Loral filed under Chapter 11 of the bankruptcy code and the action was stayed as against those entities, leaving Schwartz as the only defendant in the Globalstar securities class action.

[2] The jury in the insurance coverage trial, by stipulation of the parties, was not told that the judge in the securities class action was the judge presiding in the insurance coverage case.  (JPTO ¶ 13)  Among other things, this reduced the danger that I would inadvertently become an unsworn witness or that the jury would place undue weight on certain comments made by me in the securities action regarding the wisdom of settling that action.

(PX 23)  He noted that NERA, the damage consultants retained by Schwartz, had calculated "Plaintiffs' Style Damages," i.e the damages that a class counsel could be predicted to seek before a jury, to be in range of $2.6 to $3.1 billion.  Along with other damage calculations, Schwartz's counsel also reported a low damage estimate for a shortened class period of $91 million.

The Court suggested to the parties that they retain a private mediator.  The parties agreed and hired Jonathan Marks, Esq.  A first session was held in August 2004 and representatives of Twin City, Royal, Liberty and North American were in attendance.  Class counsel was then seeking $33 million in settlement. Twin City authorized Schwartz to make an offer of $1.5 million.  Class counsel responded to the offer by moving from $33 million to $31.5 million and the mediation session ended.

A second mediation took place on January 31, 2005 at which representatives of Twin City, Royal, Liberty and North American were present, along with Schwartz's counsel and class counsel.  Class counsel indicated that he was demanding $25 or $26 million but would settle the action for $15 million if the defendant agreed to the figure that day.  Twin City asked the excess carriers to depart the mediation session so that it could try to settle the case within the primary layer.  The excess carriers left.  In private, the mediator expressed the view to the defense camp that the case possibly could be settled for a figure below $15 million, but not below $10 million.  Twin City authorized an increase in the settlement offer to $3 million.  The offer did not result in a lowering of class counsel's demand.  The excess carriers were informed of these developments.

On February 10, 2005, counsel for North American wrote to counsel for Twin City chastising Twin City for its conduct at the January 31 mediation session.  "It is now established that the case could be settled for $15 million.  Rather than take this settlement

opportunity seriously, Hartford [i.e. Twin City] responded with an offer of $3 million." (PX 37)  "Given the damages numbers, the uncertain liability and the plaintiffs' words and deeds that confirm that they will not settle this case for less than $10 million, any reasonable party would settle the case for an amount at or above the remaining Hartford limit of liability. . . . . North American believes that this conduct on the part of Hartford is bad faith." (Id.)  Liberty took a similar position with Twin City in a letter dated March 3, 2005, but did not use the words "bad faith".  It described dismissal at the summary judgment stage as "highly unlikely" (PX 38), a prediction that would prove accurate.

A settlement discussion was held on June 10, 2005 at which class counsel reiterated the $15 million demand but indicated that his figure was likely to increase.  Counsel for Greenwich wrote to the other insurers after the June 10 mediation session expressing its view, undoubtedly colored by self-interest, that "there is a significant risk that a jury could find in favor of plaintiffs on liability."  Greenwich further expressed the view that "[i]f a jury finds for plaintiffs on liability, then it is a near certainty that the jury will award damages in excess of the program limits."  (PX 61 at 2)

With trial only days away, Schwartz's counsel wrote to Twin City and all excess carriers, by letter dated June 23, 2005, advising of the risk that class counsel's settlement demands would rise after the July 6 trial commenced and noting the implication for carriers in the upper layers:

> If this matter proceeds to trial on July 6 and the plaintiffs' willingness to settle for $15 million is withdrawn, as they have said it will be, a settlement at the amount of plaintiffs' current demand of $25 million would exhaust Liberty's policy, along with that of North American Specialty Insurance Company, and would require Starr Excess Liability Insurance Limited to contribute a significant portion of its limits.

(PX 49)  At or about the same time, Liberty's counsel wrote to Twin City and the other carriers pointing out that ". . . the possibility remains that damages may be awarded in excess of your [Twin City's] limits or indeed the Globalstar program in its entirety." (PX 51) Liberty noted that it was reserving its right to pursue all remedies against Twin City if it did not settle within its limits and those of Royal. (Id.)

On July 6, 2005, a date that had been set more than six months earlier, a jury was empanelled and the trial of the securities class action began.  On July 11, during the trial, one of Schwartz's lawyers wrote to the carriers stating the view that the uncertainty surrounding the outcome of a directed verdict motion and a motion to exclude the class expert presented a "watershed moment in the case."  (PX 78)  "There is now a window of opportunity to settle this case while plaintiffs may feel vulnerable. . . . Should that opportunity pass, we believe we will not have another similarly attractive opportunity to settle this matter." (Id.)  The email closed by "reiterate[ing] our long-pending demand that you consent to settlement of this matter." (Id.)

The evidence proceeded through the close of the class plaintiffs' case, at which time the Court granted a directed verdict on the claims under sections 11 and 15 of the 1933 Act.  The Court otherwise denied relief, meaning that, unless the Court changed course at the close of all evidence, some securities fraud claims against Schwartz would be presented to the jury for verdict.[3]

---

[3] Although it was not argued to the jury and forms no basis for my decision on any of the motions, I note that in some respects, the carriers were then placed in a "heads-I-win, tails-you-lose" posture.  A jury returning a verdict would have either found for Schwartz, and, thus, the carriers would pay nothing in indemnity or, by returning a verdict for the class plaintiffs, the jury would have implicitly found that Schwartz had engaged in securities fraud and acted with the requisite scienter.  A finding against Schwartz would arguably enable the carriers to disclaim indemnification under a policy provision contained in the Twin City policy, to which the others followed form, which excludes indemnification for any deliberate fraud. (PX 1 at ¶ V(J)).  See Mem. of Royal at 13 (Doc. # 78) In such a scenario, Schwartz may still have argued that recklessness met the scienter definition but not the policy exclusion.

Following the partial granted of a directed verdict in the securities class action trial, there were two remaining live witnesses in Schwartz's case, Schwartz and his damage expert.  Viewing his exposure if the jury were to find liability as potentially in the hundreds of millions of dollars and wiping out all or a substantial part of his net worth, Schwartz took charge of the situation and directed his lawyer Francis Menton, Esq. of Willkie Farr & Gallagher LLP, to settle the claim.  Menton explored with class counsel, Stephen Toll, Esq. of Cohen Milstein Hausfeld & Toll, PLLC, the availability of the $15 million settlement figure. In an email sent at 1:54 p.m. on Saturday, July 16, Toll was emphatic that the $15 million was "off the table," following the Court's partial denial of the directed verdict motion and that it would take $20 million to settle the case.  Toll also informed Mention that, "as the case progresses toward verdict, that number will only increase." (PX 89)

At 10:04 pm on July 17, Menton sent an e-mail to counsel for Liberty, Royal, North American and Twin City which "constitute[d] the request of Bernard Schwartz for the written consent of each of [defendant's] to a proposed settlement . . . in the amount of $20 million . . . ." (PX 92)  None of the carriers consented. (PX 93-96, 98)  On Monday, July 18, 2005, the parties advised the Court that they had reached an agreement-in-principle resolving the remaining claims in their entirety subject to Court approval.  The Court granted preliminary approval of the settlement and then discharged the jury.

Schwartz funded the settlement out of his personal assets which were transferred to class counsel on August 25, 2005.  The present action was filed on September 12, 2005.

III.   SCHWARTZ'S CLAIMS AGAINST LIBERTY AND NORTH AMERICAN

     A.   Motion for Judgment as a Matter of Law

        Liberty and North American move for judgment as a matter of law under Rule

50 or, alternatively, for a new trial under Rule 59 arguing, among other things, that Schwartz

was required to obtain their consent to any settlement and failed to do so, did not give them a

reasonable opportunity to consent and failed to cooperate as required by the policies of

insurance.  I have divided the organization of this Memorandum and Order into those

arguments which are more logically Rule 50 arguments and those which are better understood

as Rule 59 arguments.  However, I have also considered all Rule 50 arguments through the

lens of Rule 59 and all Rule 59 arguments through the lens of Rule 50.

        Rule 50(b), Fed. R. Civ. P., permits a party to move for judgment as a matter

of law or to move for a new trial under Rule 59 within ten days of the entry of judgment.

Judgment in this case was entered on January 29, 2007, and, on February 8 and 9, North

American and Liberty timely filed their motions.  Upon consideration of the motion, a court

may allow the judgment to stand, order a new trial, or direct entry of judgment as a matter of

law.  A Rule 50(b) motion "is limited to those issues specifically raised in [a] prior motion for

a directed verdict."  Cruz v. Local Union No. 3 of the IBEW, 34 F.3d 1148, 1155 (2d Cir.

1994) (internal quotations omitted).  In considering a Rule 50(b) motion, a court should be

deferential to the jury's role as the trier of fact. See Fabri v. United Technologies Int'l Inc.,

387 F.3d 109, 119 (2d Cir. 2004)(noting that in undertaking a Rule 50 motion, a court "cannot

assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute

its judgment for that of the jury."); Meloff v. New York Life Ins. Co., 240 F.3d 138, 145 (2d

Cir. 2001).  Grant of a Rule 50(b) motion is inappropriate "unless the evidence, viewed in the

light most favorable to the nonmoving party, is insufficient to permit a reasonable juror to

find in his favor." <u>Arlio v. Lively</u>, 474 F.3d 46, 51 (2d Cir. 2007) (citation omitted).

Therefore, "judgment as a matter of law should not be granted unless (1) there is such a

complete absence of evidence supporting the verdict that the jury's findings could only have

been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount

of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive

at a verdict against [it]." <u>Advance Pharm., Inc. v. United States</u>, 391 F.3d 377, 390 (2d Cir.

2004) (quoting <u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136 F.3d 276, 289 (2d Cir.

1998)).

      1.    <u>Choice of Law</u>

      A preliminary issue to be resolved is the law governing the policies of

insurance purchased by GTL from Twin City, Liberty and North American which afforded

coverage to Schwartz.  The choice of law rules of the forum state, New York, govern in this

diversity action.  <u>See</u> <u>Klaxon Co. v. Stentor Electric Manufacturing Co.</u>, 313 U.S. 487, 496-97

(1941). "[T]he first step in any choice of law inquiry is to determine whether there is an

'actual conflict' between the laws invoked by the parties."  <u>Harris v. Provident Life and Acc.</u>

<u>Ins. Co.</u>, 310 F.3d 73, 81 (2d Cir. 2002) (citing <u>In re Allstate Ins. Co.</u>, 81 N.Y.2d 219, 223

(1993)).  Here, the Court concludes that there are sufficient variances in how California and

New York construe the obligations of an insurer to an insured, and vice-versa, to make the

choice of law analysis warranted.  <u>E.g.</u>, <u>compare</u> Cal. Civ. Jury Inst., Inst. 2321 <u>with</u> NYJPI

4:78.

      If a conflict is found in substantive law, then, in the absence of an express

choice of law provision, New York would apply a "center of gravity" or "grouping of the

contacts" approach.  <u>Tri-State Employment Servs, Inc. v. Mountbatten Sur. Co., Inc.</u>, 295

F.3d 256, 260-61 (2d Cir. 2002) (citing <u>In re Allstate Ins. Co.</u>, 81 N.Y.2d at 227).  "[C]ourts

may consider a variety of significant contacts, including the place of contracting, the places of

negotiation and performance, the location of the subject matter, and the domicile or place of

business of the contracting parties."  Tri-State, 295 F.3d at 261.  In the context of insurance

contracts, New York courts also consider many of the factors enumerated in the Restatement

on Conflicts of Laws § 193, including "the location of the insured risk; the insured's principal

place of business; where the policy was issued and delivered; the location of the broker or

agent placing the policy; where the premiums were paid; and the insurer's place of business."

Olin Corp. v. Ins. Co. of North America, 743 F.Supp. 1044, 1049 (S.D.N.Y. 1990), aff'd, 929

F.2d 62 (2d Cir. 1991); see also Zurich Ins. Co. v. Shearson Lehman Hutton, Inc., 84 N.Y.2d

309, 317 (1994).

        Here, the Twin City policy lists GTL as the "Company" and lists its address as

San Jose, California.  Endorsement 1 expands the definition of the insured company to

include, among other entities, Globalstar L.P.  Endorsement 6 to the Twin City policy is titled

"Cancellation Endorsement-California Law".  The Liberty Policy is also addressed to GTL in

San Jose.  It largely follows form of the Primary Carrier's policy in that it recites that "[i]t

incorporates by reference the insuring clauses" and other material terms of the primary policy.

The North American policy is also addressed to GTL in San Jose.  It contains an Endorsement

2, entitled "California Changes—Cancellation and Nonrenewal".  Neither the Twin City,

Liberty, nor North American policies contain endorsements required by the law of any other

state.  I also note that Globalstar had several hundred employees based in California and less

than a dozen in New York.

        Moreover, with respect to the contract of insurance between GTL and Twin

City, Schwartz took the position that California law applies and, at trial, Twin City elected to

take no position.  Liberty asserted that California law applies to its policy covering Schwartz

and North American did not dispute that California law applied to its policy covering Schwartz.

This Court concluded then and reaffirms now that California law governs the interpretation of the Twin City, Liberty and North American policies.

2.     The Evidence

There was more than ample evidence from which the jury could properly conclude that North American and Liberty had breached their contracts of insurance with Schwartz.  Liberty and North American did not dispute that the claims were covered by the policies of insurance and that Schwartz had given them timely notice of the claims.   The evidence was overwhelming that throughout the course of the securities litigation, Schwartz, through his lawyer, Menton, had kept all of the insurance carriers informed of the progress of the case, responded to their inquires and followed their reasonable instructions.  In short, Schwartz, through his counsel, fully acquitted his contractual obligation to cooperate with the insurers.

Schwartz was required to obtain the consent of Liberty before making a settlement offer or agreeing to a settlement.[4]  He was also required to obtain North American's consent before settling the claim.[5]

There is no dispute—and the jury was instructed—that Liberty and North American did not consent to the settlement and Liberty did not consent to the offer that led to the settlement.  The jury was also instructed that, by the terms of its contract, Liberty could not act unreasonably in withholding consent and North American was required to act in good

---

[4] The Liberty policy provides that "[t]he insureds shall not admit liability for, offer to settle or settle any claim or incur costs of defense, where the liability, settlement and/or costs of defense are reasonably likely to involve the limit of liability of this Policy without the Insurer's prior written consent which consent shall not be unreasonably withheld."

[5] The North American policy recites that, "[w]e will have no obligation under this insurance with respect to any claim or suit that is settled without our consent."

faith in withholding consent. See Comunale v. Traders and General Ins. Co., 328 P.2d 198, 201 (Cal. 1958).  The jury was further instructed, in accordance with California law that it may consider the totality of the facts and circumstances known to the party whose conduct they were considering in deciding whether they acted reasonably or in good faith. See Betts v. Allstate Ins. Co., 201 Cal. Rptr. 528, 538-39 (4th Dist. 1984); Transit Casualty Co. v. Spink Corp., 156 Cal. Rptr. 360, 367 (3d Dist. 1979), overruled on other grounds, Commercial Union Assurance Co. v. Safeway Stores, Inc., 610 P.2d 1038 (Cal. 1980).  The jury was also instructed that it should consider the overall reasonableness of an offer or settlement in light of the degree of risk that Schwartz would have been found liable in the securities class action and the amount of damages that likely would have been awarded. See Johansen v. California State Auto. Assn. Inter-Ins. Bureau, 538 P.2d 744 (Cal. 1975).

The evidence before the jury, ably developed through the direct and cross-examinations of four sets of counsel, included each step of the claim monitoring, evaluation and negotiation process.  The jury heard from Menton, Toll, Schwartz and representatives of Twin City.  There was testimony at trial from Richard Hans, Liberty's counsel, and Jon O'Neil, North American's counsel, that both carriers were consulted throughout the settlement discussions leading up to the trial and, in fact, actively advised counsel for Schwartz in regard to the Excess Carriers' perspective on settlement.  (Tr. 121-23, 673, 484, 894)

There was more than ample evidence to support the jury's verdict that Schwartz had fully complied with his contractual obligations and that Liberty had unreasonably withheld its consent and that North American had not acted in good faith in withholding its consent to the $20 million settlement. The timing of Schwartz's request for consent could not be judged in a vacuum.  The Excess Carriers were up to speed on all that

had transpired previously.  Events were occurring at a rapid pace and, although the securities

action had been pending for over four years, the trial clock had run down to the concluding

days before the case would be in the hands of the jury.  There was sufficient evidence on

which that the jury could properly conclude that Liberty had not acted reasonably and North

American had not acted in good faith in withholding consent to the class action settlement.

Accordingly, the motions for judgment as a matter of law are denied.

> B.  <u>Motion for a New Trial</u>

A party may move for a new trial in an action that was tried before a jury

pursuant to Rule 59(a)(1), Fed. R. Civ. P.  Unlike a motion for judgment as a matter of law,

Rule 59 permits a court to grant a new trial even if substantial evidence exists to support the

jury's verdict. <u>See</u> <u>Song v. Ives Lab., Inc.</u>, 957 F.2d 1041, 1047 (2d Cir. 1992).  However, a

Rule 59(a) motion "ordinarily should not be granted unless the trial court is convinced that the

jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."

<u>Patrolmen's Benevolent Ass'n v. City of New York</u>, 310 F.3d 43, 54 (2d Cir. 2002)(internal

quotation marks omitted), <u>cert. denied</u>, 538 U.S. 1032 (2003).

> 1.  <u>Weight of the Evidence</u>

The jury's verdict was fully consistent with the greater weight of the credible

evidence.  Menton, Schwartz and Toll testified persuasively and with substantial consistency.

The trail of emails and correspondence bolstered their testimony.  The body of evidence

supported the jury's conclusions.  So much of the parties' motions as expressly or impliedly

rely upon the weight of the evidence as a ground for seeking a new trial of the claim brought

by Schwartz are denied.

2.     Jury Instructions

An error in jury instructions may provide a basis for the grant of a new trial.

Wright, Miller, & Kane, Federal Practice § 2805 at 54 (West 1995).  See, e.g. Hiller v. County

of Suffolk, 199 F.R.D. 101, 106 (E.D.N.Y. 2001).  "A jury instruction is erroneous if it

misleads the jury as to the correct legal standard or does not adequately inform the jury on the

law." LNC Invs., Inc. v. First Fidelity Bank, N.A., 173 F.3d 454, 460 (2d Cir. 1999) (quoting

Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994)).  "An instruction must [ ] allow the jury

to adequately assess evidence relied on by a party." District Council 37, Am. Fed'n of State,

County & Mun. Employees, AFL-CIO v. New York City Dep't of Parks and Recreation, 113

F.3d 347, 355 (2d Cir. 1997) (citation omitted).  However, "a single instruction to a jury may

not be judged in artificial isolation, but must be viewed in the context of the overall charge."

Boyde v. California, 494 U.S. 370, 378 (1990) (citing Boyd v. United States, 271 U.S. 104,

107 (1926)); Raymond v. Int'l Business Machines Corp., 148 F.3d 63, 67-68 (2d Cir. 1998).

A new trial is not warranted unless "the instructions were prejudicial and highly confusing."

Raymond, 148 F.3d at 67 (internal quotations and citation omitted); see Terminate Control

Corp. v. Horowitz, 28 F.3d 1335, 1345 (2d Cir. 1994)(no reversal required unless "based on a

review of the record as a whole, . . . the error was prejudicial or the charge was highly

confusing").  Where an instruction is erroneous, a party is entitled to a new trial unless the

court determines that the error did not influence the jury's verdict. See Gordon v. New York

City Bd. of Educ., 232 F.3d 111, 115-16 (2d Cir. 2000) (citing LNC Invs., 173 F.3d at 460).

Liberty, in a rather perfunctory manner, argues that it is entitled to a new trial

because "the jury instructions improperly allowed the jury to skip over the pre-requisite to

coverage under the Liberty Policy that the insured 'shall not . . . offer to settle or settle any

claim,' and permitted the jury to jump to the question of Liberty's reasonableness in

withholding consent and whether Schwartz was 'excused' from seeking consent." (Liberty Mem. 9)  North American mounts a similar challenge: "the jury instructions allowed the jury to find that Schwartz was excused from asking for consent to the settlement before it was entered into . . . by omitting any language requiring the jury to find whether or not, separate and apart from the issue of obtaining North American's consent, Schwartz satisfied the condition precedent to coverage of affording North American an opportunity to grant or withhold consent to the settlement before it was entered into in the Globalstar action." (North American Mem. at 14)  The actual instructions delivered by the Court are not as characterized by Liberty or North American.

First, the jury was instructed, in the actual language of the contracts, of Schwartz's obligation to obtain Liberty's and North American's consent:

> Under the terms of the Liberty policy, Mr. Schwartz was not permitted to "admit liability for, offer to settle or settle any claim . . . reasonably likely to involve the limit of liability of [Liberty's] Policy, without the Insurer's prior written consent."  It also provided that "consent shall not be unreasonably withheld" by Liberty to either a settlement offer or an actual settlement.

> The North American policy provides that it has no obligation with "respect to any claim or suit that is settled without [North American's] consent."  While North American's policy does not contain the same explicit requirement that consent to a settlement may not be unreasonably withheld, the law implies an obligation of good faith and fair dealing on the part of North American in deciding whether to give its consent to any settlement.[6]

(Court Ex. 7 at 16)[7]

---

[6] The jury was also instructed on the implied duty of good faith and fair dealing.  The jury was charged that "[i]n the context of consent to a settlement or to the making of a settlement proposal or offer, good faith means that an insurer takes into account the interest of the insured and gives it at least as much consideration as it does to its own interest.  An insurer would not have acted in good faith if it refused to consent to a settlement or to a settlement offer or proposal which the insurer knew was reasonable." (Tr. 1348); See Communale v. Traders & Gen. Ins. Co., 328 P.2d 198, 201 (Cal. 1958); Silberg v. California Life Ins. Co., 521 P.2d 1103 (Cal. 1974).

[7] I am unaware of any material difference between the transcript of the charge which controls and the typed version supplied to the jury which does not.  Because the typed version contains the punctuation used in the policies, I have cited it for ease of understanding.

The jury was also instructed that Schwartz had not obtained the insurer's consent:

> There is no dispute that Liberty and North American did not consent to the settlement of the Globalstar Class Action.  Nor is there a dispute that Liberty did not consent to the offer that led to the settlement.

(Court Ex. 7 at 19)

Finally, the jury was instructed as to the standard to be applied in determining whether Schwartz was excused from the obligation to obtain consent and that on this issues he, not the Excess Carriers, bore the burden of proof:

> However, you may determine that Mr. Schwartz was excused from the requirement that he obtain insurer consent.  On this issue, Mr. Schwartz bears the burden of proof.
>
> In determining whether Mr. Schwartz was excused from the policies' consent requirements, you are to determine whether Liberty has acted reasonably and North American in good faith in not providing any required consent.  You are to make this determination as to each excess insurer separately.  You may consider the totality of the facts and circumstances known to the parties whose conduct you are considering.  In evaluating whether Mr. Schwartz was excused from the consent provisions of the insurance policies, you may consider such factors as the timing of any offer to settle or settlement and the insurers' opportunity to evaluate the offer to settle or settlement.  You may also consider the overall reasonableness of an offer or settlement in light of the degree of risk that Mr. Schwartz would have been found liable to the Globalstar plaintiffs in the Globalstar Class Action and the amount of damages that likely would have been awarded against Mr. Schwartz in the event he were to have been found liable in the Globalstar Class Action.

(Court Ex. 7 at 19-20).

North American argues that the insured must demonstrate that it sought consent of the insurer and, if the insured failed to do so, then there is no duty to indemnify. Thus, in its view, the question is not whether it unreasonably withheld consent but whether the insured reasonably sought consent.

The jury was instructed that the duty of good faith and fair dealing applied to Schwartz's conduct. (Tr. 1348)  The Court instructed the jury on the language of the consent provision of the contracts and the requirement "that Schwartz fulfilled his significant obligations under the contract[s] . . . ." (Tr. 1352)  I note, parenthetically, the language of the North American policy says nothing about a _request_ for consent or its manner and timing; it states that "[w]e have no obligation under this insurance with respect to any claim or suit that is settled without our consent." (PX 4 at 3)  This provision should be contrasted with the detailed "Notice" of claim provisions in the primary policy, which are incorporated into North American's policy.[8] (PX 1 at 11)  In any event, the evidence was uncontradicted that Schwartz, in fact, _sought_ the Excess Carrier's consent. The 10:04 p.m. email of July 17 succinctly recites that "[t]his email constitutes the request of Bernard Schwartz for the written consent of each of you to a proposed settlement of the above litigation."  (PX 92)

Reasonableness enters the equation in regard to the insurer's opportunity to consider the request to consent.  This was made clear in the Court's instructions that "[i]n evaluating whether Schwartz was excused from the consent provisions of the insurance policies, you may consider such factors as the timing of any offer to settle or settlement and the insurers' opportunity to evaluate the offer to settle or settlement." (Tr. 1351)  However, because it was Schwartz's burden of proof to establish that he was excused from obtaining consent and the jury was told that the "timing" and "opportunity to evaluate" the offer were relevant considerations, it makes little difference whether these factors were considered as part of the reasonableness of the request to consent or the reasonableness of the opportunity to consider the request to consent.  Upon scrutiny, North American's argument that the jury

---

[8] The language of the Liberty policy is silent as to any specific request requirement of obtaining consent but speaks of "the Insurer's prior written consent, which consent shall not be unreasonably withheld.." (PX 3 at 4) This should be contrasted with the "Notice of Claim" requirement in the Liberty policy (_Id_.)

should have been instructed that it may consider the reasonableness of the request to consent is a restatement of what the jury was told---that it may consider the reasonableness of the opportunity to consider the request; it is a distinction without a difference.  No California authority cited by the Excess Carriers squarely places the reasonableness inquiry on the insured's request as distinguished from the insurer's opportunity to consider the request or suggests that there is a meaningful distinction between the two.

In considering the reasonableness of the Excess Carriers' opportunity to evaluate the offer, the jury was instructed that the course of performance between the parties could be taken into account. (Tr. 1349)  The jury heard testimony about the prior mediation sessions, most attended in substantial part by the Excess Carriers, in which the participants were expected to react to a settlement offer or counter-offer during the course of a single mediation session.  No opportunity for lengthy, quiet reflection or extensive consultation was provided.  Indeed, at one point, North American was quite vocal in its criticism of the adequacy of an on-the-spot counter-offer by Twin City made during a mediation session.  (PX 37)  It was a pure jury question whether considering the totality of the circumstances – including the "timing" of the offer and the "opportunity to evaluate" – the Excess Carriers had acted reasonably and in good faith in withholding their consent to a request that, undeniably, had been made.

The Excess Carriers also quarrel with the Court's identification of permissive considerations in evaluating "the totality of the facts and circumstances known to the parties whose conduct you are considering." (Tr. 1351)  So, for example, instead of telling the jury that it "may" consider the "timing" and "opportunity to evaluate" the offer, the instruction should have read, in their view, that you "must" consider such factors.  But the jury was instructed that ". . . your verdict must be based on all the evidence presented." (Tr. 1339)

Thus, it was not free to ignore evidence on such subjects as "timing" and "opportunity to evaluate". The weight of such evidence was quite properly left to the jury.

The jury instructions regarding the breach of contract claim conformed to the model instruction and California case law. see Cal. Civ. Jury Instr., CAJI 303; Johansen v. California State Auto. Assn. Inter-Ins. Bureau, 538 P.2d 744, 748 (Cal. 1975); Betts, 201 Cal. at 538-39 (discussing the "permissible considerations in evaluating the reasonableness of the settlement offer" an insurer may undertake)(emphasis added). The Court's instructions were neither erroneous nor misleading.

> C.     Schwartz's Motion For Pre-Judgment Interest

For Erie purposes, the availability of pre-judgment interest is considered a substantive rather than procedural issue. See Schwimmer v. Allstate Ins. Co., 176 F.3d 648, 650 (2d Cir. 1999). In determining which jurisdiction's laws should govern the availability of pre-judgment interest, New York choice of law principles dictate that the law of the jurisdiction whose law determined liability controls also the allowance of pre-judgment interest. See Gold-Flex Elastic Ltd. v. Exquisite Form Indus., Inc., 1995 WL 764191, *2 (S.D.N.Y. Dec. 28, 1995)(citing Patch v. Stanley Works, 448 F.2d 483, 494 n.18 (2d Cir. 1971)("consistent line" of decisions holding that under New York choice of law principles "allowance of pre-judgment interest is controlled by the rule of the jurisdiction whose law determines liability")). As California's law determined liability in regard to the breach of contract claim, it also determines the availability of pre-judgment interest.

Under California statutory law, "[e]very person who is entitled to recover damages certain . . . and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day." Cal. Civ. Code § 3287(a). Interest, if recoverable, is assessed at a rate of 10% per year. Cal Civ. Code § 3289(b). "[D]amages are

considered certain or capable of being made certain where there is essentially no dispute between the parties concerning the basis of computation of damages if any are recoverable but where their dispute centers on the issue of liability giving rise to damage." Safeway Stores, Inc. v. Nat'l Union Fire Ins. Co., 64 F.3d 1282, 1291 (9th Cir. 1995) (quotation omitted)(applying California law); Fireman's Fund Ins. Co. v. Allstate Ins. Co., 286 Cal. Rptr. 146, 158 (3d Dist. 1991)  Additionally, the determination of whether to award pre-judgment interest is subject to the equitable "countervailing policy that injured parties should be compensated for the loss of the use of their money during the period between the assertion of a claim and the rendition of judgment."  Chesapeake Indus. Inc., v. Togova Enterprises, Inc., 197 Cal. Rptr. 348, 351 (2d Dist. 1983) (citing McConnell v. Pacific Mutual Life Ins. Co., 24 Cal. Rptr. 5, 11 (2d Dist. 1962) ("The underlying theory upon which interest is recovered (absent an express contract to pay interest) is that the creditor is damaged by the withholding of his money, and that an allowance of interest is just compensation for such damage.").

Liberty and North American do not dispute that Schwartz is entitled to recover pre-judgment interest under § 3287(a).  Rather, they contend that Schwartz's right to recover pre-judgment interest did not "vest" within the meaning of § 3287(a) until their respective policies were exhausted which did not occur until the entry of judgment in this litigation on January 29, 2007.  However, Liberty and North American were on notice that their policies, indeed the policy limits of the Liberty policy and more than half of the North American policy, were implicated at the time that the Globalstar Class Action settled on July 18, 2005.  Awarding plaintiff pre-judgment interest, in this case, is consistent with the policies and equitable considerations that underlie § 3287(a).

When Schwartz's money was transferred to class counsel on August 25, 2005, he was damaged in a sum certain and his right to recover pre-judgment interest on that sum

vested.  Following the principal that "interest is allowed from the date the cause of action

arises if the goods or services in question have a well recognized or readily ascertained market

value", <u>McConnell</u>, 24 Cal. Rptr. at 11 (citations omitted), this Court concludes that Schwartz

is entitled to an award of pre-judgment interest from the date that he paid the Globalstar Class

Action settlement, August 25, 2005.  Accordingly, there were 523 days between August 25,

2005 and January 29, 2007, the date that judgment in this action was entered.  Pursuant to §

3289(b), the rate of interest is 10% per year, rendering Schwartz entitled to a total of 14.33%

pre-judgment interest on the damages awarded to him by the jury.  Liberty's portion of pre-

judgment interest is $716,500 and North American's $585,484.12.

IV.    <u>TWIN CITY'S MOTIONS ON THE BAD FAITH CLAIM</u>

The jury found in North American and Liberty's favor on their bad faith cross-

claims against Twin City, awarding North American $3 million and Liberty $2 million.

However, in response to a special interrogatory, the jury also found that Twin City had not

acted with "gross disregard".

Defendants North American, Liberty and Twin City have filed post-trial

motions directed to the bad faith claims.  Twin City seeks judgment as a matter of law,

pursuant to Rule 50, Fed. R. Civ. P., or, alternatively, for relief pursuant to Rule 59, Fed. R.

Civ. P., in regard to the claims against it by North American and Liberty.  It is unclear from

the face of Twin City's motion whether it intends to move under any specific sections of Rule

59.  I will therefore treat the motion as seeking all Rule 59 relief possible, including a new

trial, pursuant to Rule 59(a)(1), or, should New York law be apply to the bad faith claim, for

modification of the judgment, pursuant to Rule 59(e).

A Rule 59(e), Fed. R. Civ. P., motion seeks to alter or amend a judgment.

Rule 59(e) does not prescribe specific grounds for granting a motion to alter or amend an

otherwise final judgment.  However, there are classically four grounds on which a Rule 59(e)

motion may be granted: "First, the movant may demonstrate that the motion is necessary to

correct manifest errors of law or fact upon which the judgment is based.  Second, the motion

may be granted so that the moving party may present newly discovered evidence or

previously unavailable evidence.  Third, the motion will be granted if necessary to prevent

manifest injustice . . . Fourth, a Rule 59(e) motion may be justified by an intervening change

in controlling law." Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 2810.1

(1995); see also Munafo v. Metropolitan Transp. Authority, 381 F.3d 99, 105 (2d Cir. 2004).

A decision to grant a Rule 59(e) motion is within the discretion of the district court, see

McCarthy v. Manson, 714 F.2d 234, 237 (2d Cir. 1983), and so where a party raises a choice

of law issue on a Rule 59(e) motion that it has not raised prior to entry of judgment, it is

unnecessary for a court to address the motion.  However, where open questions relating to

choice of law may prevent a party from the entry of an appropriate judgment following trial, a

motion pursuant to Rule 59(e) is the proper method by which to seek alteration of a judgment

once any choice of law issues are resolved. See Employers Mut. Cas. Co. v. Key Pharms. Inc.,

886 F.Supp. 360, 362 (S.D.N.Y. 1995); Turkmani v. Republic of Bolivia, 273 F.Supp.2d 45,

51-52 (D.D.C. 2002) (amending judgment under Rule 59(e) to apply New York law as

opposed to the District of Columbia's law).

It is unclear from the movant's papers the extent to which their motions rely

upon Rule 59(a) or (e), as opposed to Rule 50(b).  This Court will address Liberty and North

American's motions as seeking judgment as a matter of law, or, alternatively, a new trial.

Given that a "postjudgment motion requesting alteration or amendment of the judgment but

denominated a motion under a Rule other than Civil Rule 59(e) is generally treated as having

been made under Rule 59(e)", Lichtenberg v. Besicorp Group Inc., 204 F.3d 397, 401 (2d Cir.

2000), the Court will treat Twin City's motion as seeking a modification of the judgment under Rule 59(e).  Because I determine that amendment of the judgment is appropriate under Rule 59(e), I do not address Twin City's motion for judgment as a matter of law or, alternatively, a new trial.  I note, however, that were I to address Twin City's motion as a motion pursuant to Rule 50(b) rather than 59(e), the outcome would be the same.

      A.     <u>Choice of Law</u>

      Twin City contends that North American has consented to having New York law applied to the bad faith claim and is now bound to the application of New York law.  A party may consent to the application of a particular jurisdiction's law, before a dispute arises or post-dispute during the course of litigation, either explicitly or implicitly, and that consent "'is sufficient to establish choice of law.'"  <u>Krumme v. WestPoint Stevens Inc.</u>, 238 F.3d 133, 138 (2d Cir. 2000) (quoting <u>Tehran-Berkeley Civil & Envtl. Engrs and Tippetts-Abbett-McCarthy-Stratton</u>, 888 F.2d 239, 242 (2d Cir. 1989)(finding that the parties' reliance on New York law in their briefs established implied consent to choice of law)).  A party's choice of law, however, is not inherently binding.  A party's choice of law, whether explicit or implicit by the conduct of the parties, "may be disregarded where the most significant contacts with the matter in dispute are in another State . . . or where [a] strong countervailing public policy" demands that the court apply a jurisdiction's laws other than that to which the parties have consented. <u>See</u> <u>Walter E. Heller & Co. v. Video Innovations Inc.</u>, 730 F.2d 50, 52 (2d Cir. 1984).

      Here, Twin City urges that North American is bound by its persistent and well-argued position throughout the case that New York law should apply to the bad faith cross-claim and cannot now, following a jury verdict which is unfavorable to North American under

New York law, reverse its position.[9]  In discussions with counsel during the course of the trial and on the motion for summary judgment prior to trial, North American staunchly maintained that New York law governs the bad faith claim. (Tr. 274-76)  Despite North American's apparent urging of New York law, I decline to find that North American is bound by its implicit consent to the application of New York law to the bad faith claim.  Rather, I conclude that application of traditional choice of law principles leads to the conclusion that, in the main, New York law applies to the bad faith claim.

A federal court sitting in diversity must apply the choice of law rules of the forum state in which it sits. Klaxon, 313 U.S. at 496-97; Beth Israel Med. Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc., 448 F.3d 573, 582 (2d Cir. 2006).  The initial step in a case which presents "a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." Beth Israel, 448 F.3d at 582 (citing Allstate, 81 N.Y.2d at 223).  With one relevant exception, the substantive bad faith principles of New York and California are not substantially different.[10]  New York requires a finding that the insurer acted with "gross disregard" of the rights of the other party to the contract, a requirement which is not present in California law.

Having concluded that the substantive law of New York and California are in conflict, the next inquiry is to examine the mode of analysis New York courts would apply to the choice of law question.  New York courts typically consider whether a claim sounds in

---

[9] I note that the doctrine of judicial estoppel is inapplicable here because, among other reasons, North American was not successful in urging that this court adopt New York law in regard to the bad faith claim. See New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001).  Instead of definitively ruling on the choice of law issue, the Court elected to charge the jury on the elements common to both California and New York bad faith claims.  The Court then instructed and separately inquired of the jury on whether the Excess Carriers had satisfied New York's gross disregard standard.

[10] The availability of punitive damages under California law is also a distinguishing factor but is inapplicable here as Liberty and North American did not seek punitive damages. (Tr. 6, 18)

tort or in contract. <u>Compare</u> <u>Babcock v. Jackson</u>, 12 N.Y.2d 473, 477 (1963) <u>with</u> <u>Tri-State</u>, 295 F.3d at 260-61.

       Jurisdictions differ as to whether bad faith claims arising out of an insurer's failure to settle are properly viewed as tort claims or contract claims.  Under California law, for example, a bad faith claim based on "a breach of the insurer's obligation to accept a reasonable offer of settlement, a duty included within the implied covenant of good faith and fair dealing, 'sound[s] in both contract and tort.'" <u>Johansen</u>, 538 P.2d at 750 (citations omitted).  Conversely, under New York law, a bad faith claim for unreasonable failure to settle sounds in contract. <u>See</u> <u>New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.</u>, 352 F.3d 599, 606 (2d Cir. 2003)("New York appears to classify suits against insurance carriers for bad-faith refusals to settle . . . as contractual in nature.")(citing <u>Roldan v. Allstate Ins. Co.</u>, 149 A.D.2d 20 (1st Dept. 1989)); <u>New York Univ. v. Continental Ins. Co.</u>, 87 N.Y.2d 308, 315-16 (1995); <u>Acquista v. New York Life Ins. Co.</u>, 285 A.D.2d 73, 81 (1st Dept. 2001)(noting that "the duties and obligations of the parties [to an insurance policy] are contractual rather than fiduciary")(internal citation and quotation omitted). New York courts apply the contractual "grouping of contacts" analysis to determine which jurisdiction's substantive law should govern. <u>See</u> <u>Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.</u>, 84 N.Y.2d 309, 317 [1994].  Under the grouping of contacts test, courts consider "a variety of significant contacts", <u>Tri-State</u>, 295 F.3d at 260-61, although ". . . the traditional choice of law factors —the places of contracting and performance— are given heavy weight in [this] analysis." <u>American Home Assur. Co. v. Merck & Co., Inc.</u>, 329 F.Supp.2d 436 (S.D.N.Y. 2004)(internal quotation marks and citation omitted).

       Here, a traditional "grouping of contacts" analysis favors application of New York law to the bad faith claim.  New York has the greatest contacts with the bad faith claim.

New York was the place of "performance" of the contract as it is the place where the events which constitute the basis of the underlying lawsuit occurred as well as where that suit was filed and defended. See U.B. Vehicle Licensing Inc. v. Atlantic Mut. Ins. Co., 2004 WL 503729, *5 (S.D.N.Y. March 12, 2004). Additionally, New York is where the claim was handled and where all settlement discussions occurred, including the eventual settlement. See Zurich, 84 N.Y.2d at 317. Further, New York is the site of any alleged breach of the covenant of good faith and fair dealing since any wrongful conduct, including an unreasonable refusal to settle, occurred in New York. Additionally, New York has a substantial public policy interest in application of its bad faith law.

Under certain circumstances, the grouping of contacts analysis is informed by consideration of the "policies underlying conflicting laws." See Zurich, 84 N.Y.2d 318-19. New York's public policy is considered "where the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests." Allstate, 82 N.Y.2d at 226. Consideration of the policies underlying New York's bad faith law is apt in cases such as this one. See Zeevi & Sons v. Grindlays Bank, 37 N.Y.2d 220, 227 (1975). While "consideration of governmental interests does not transform the analytical paradigm into one of 'interest analysis'", Zurich, 84 N.Y.2d at 319, there is a persistent tort-like quality to third-party bad faith claims. As one New York court has stated, "the insurer's liability for a bad faith failure to settle within the policy limits is ex delicto even though it arises out of a contract." Levantino v. Insurance Co. of North America, 102 Misc.2d 77, 87-88 (Supreme Court, New York County 1979). I conclude that whether viewed through the lens of contract analysis or tort analysis, "the respective 'governmental interests' of the competing jurisdictions" merit consideration. Certain Underwriters at Lloyd's v. Foster Wheeler Corp., 36 A.D.3d 17, 34 (1st Dept. 2006)(citing Zuirch, 84 N.Y.2d at 318).

New York has a long history as one of the world's financial and insurance centers.  See J. Zeevi & Sons, 37 N.Y.2d at 227; Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 294 (2d Cir. 2001) (citing Intercontinental Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2ed 372 (1969)).  The significant presence of the insurance industry within the state yields a strong interest in its regulation.  As a threshold matter, there is a state interest in enforcing the "well-established proscription against permitting an insurer to place its own financial interests above those of its insured." Ansonia Assocs. Ltd. Partnership v. Public Serv. Mut. Ins. Co., 257 A.D.2d 84, 86 (1st Dept. 1999).  As the Second Circuit has recently noted, "[t]he availability of a cause of action for bad faith signals New York courts' recognition that an insurer has an economic incentive not to settle because allowing a case to go to a jury may result in a verdict for less than the insurer's policy limit." Greenidge v. Alllstate Ins. Co., 446 F.3d 356, 361 (2d Cir. 2006); see Smith v. General Accident Ins. Co., 91 N.Y.2d 648 (1998).  However, in setting forth the gross disregard standard that now governs the finding of bad faith, the New York Court of Appeals also recognized that the need to protect the insured is counterbalanced by the "policy consideration" evinced in "courts' understandable reluctance to expose insurance carriers to liability far beyond the bargained-for policy limits . . . ." Pavia v. State Farm Mut. Auto. Ins. Co., 82 N.Y.2d 445, 452 (1993).  Carefully striking a balance between these competing interests, the Court rejected imposition of the higher "sinister motive" standard as well as the lower negligence standard in favor of the gross disregard standard. Id. at 454.  Following Pavia, there continues to remain "a strong presumption in New York against a finding of bad faith liability by an insurer." Hugo Boss Fashions Inc. v. Federal Ins. Co., 252 F.3d 608, 624 (2d Cir. 2001)(citing Sukup v. State, 19 N.Y.2d 519, 522 (1967)).  New York has a compelling interest in application of its bad faith law to this claim.  This, combined with New York's contacts with the securities class action,

its defense, evaluation and settlement, leads to the conclusion that New York law governs the bad faith claim.

I further note that there is nothing either inconsistent or unduly burdensome in application of the law of New York to the insurer's state of mind and the law of California to the interpretation of the contracts. Cf. Babcock, 12 N.Y.2d at 484 ("[T]here is no reason why all issues arising out of a tort claim must be resolved by the same jurisdiction.").[11]   See, e.g., Hutner v. Greene, 734 F.2d 896, 899-901 (2d Cir. 1984) (New York law applied to contract issue, California law applied to regulatory issue); Corporacion Venezolana, 629 F.2d at 794-95 (New York law applied to contract issue, Venezuelan law applied to fraud issue); Don King Prods., Inc. v. Douglas, 742 F.Supp. 741, 771 n.30 (S.D.N.Y. 1990)(noting that "a claim of tortious interference with contract appears to be the sort of mixed claim that might call for exercise of depecage.").

The Court has concluded that California law governs the interpretation and meaning of the contracts of insurance, which were formed before any claim arose.  The conduct of the Primary Carrier and Excess Carriers in handling the claim occurred in New York and it is appropriate that New York law govern all aspects of the bad faith claim, other than the meaning and interpretation of the contracts of insurance.[12]

---

[11] Dépeçage, from the French for dismemberment, "occurs where the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate the other issues.  The technique permits a more nuanced handling of certain multistate situations and thus forwards the policy of aptness." Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 795 n.8 (2d Cir. 1980), cert. denied, 449 U.S. 1080 (1981) (quoting A.T. von Mehren, Special Substantive Rules for Multistate Problems: Their Role and Significance in Contemporary Choice of Law Methodology, 88 Harv. L. Rev. 347 (1974)).

[12] While some courts have suggested that "an unnecessarily confusing situation would result if the law of one state is used to interpret the insurance agreement regarding the breach of contract claim and the law of a second state is applied to interpret the same agreement with regard to the bad faith claim." In re Payroll Express, 2005 WL 2438444, *14 (Bankr. S.D.N.Y. 2005)(citing Lafarge Corp. v. Nat'l Union Fire Ins. Co., 935 F. Supp. 675, 692 (D.Md. 1996)), I conclude that is not the case on these facts.  While a first-party bad faith claim, such as that for bad faith handling of a claim, may be inextricably intertwined with the insurance contract and therefore the same state's law should govern both claims, see Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 218 (1985)(applying Wisconsin law), that is not the circumstance presented in this third-party claim for unreasonable

B.      The Application of New York law and the
        Jury's Verdict

An insurer's duty of "good faith" in regard to settlements is an implied

obligation that is derived from the contract of insurance. Gordon v. Nationwide Nat'l Ins. Co.,

30 N.Y.2d 427, 436-437 (1972).  It is implied by operation of law in all contracts of

insurance. Yonkers Contracting Co., Inc. v. General Star Nat'l Ins. Co., 14 F.Supp.2d 365,

373 (S.D.N.Y. 1998)(citing Insurance Law § 2601(a)(4) (McKinney's 1985)); Betts, 201 Cal.

Rptr. at 537-38 ("In addition to the duties imposed upon the parties to a contract by the

express terms of their agreement the law implies in every contract a covenant of good faith

and fair dealing.")(citing Egan v. Mutual of Omaha Ins. Co., 620 P.2d 141 (Cal. 1979).

The bad faith doctrine developed from "the fact that insurers typically exercise

complete control over the settlement and defense of claims against their insureds, and, thus,

under established agency principles may fairly be required to act in the insured's best

interests."  Pavia, 82 N.Y.2d at 452-53 (citation omitted).  In the context of a claim by an

excess insurer against the primary insurer, the doctrine recognizes the "inherent conflict"

between the primary insurer's desire to settle the claim for as little as possible and the excess

insurer's desire to avoid liability. Cf. Smith, 91 N.Y.2d at 653.

Insurers owe a duty to their insured "to act in 'good faith' when deciding

whether to settle" a claim and the insurer "may be held liable for breach of that duty." Pinto v.

Allstate Ins. Co., 221 F.3d 394, 298 (2d Cir. 2000).  Under  New York law, the insurer's duty

to act in good faith is also owed directly to any excess insurers. See Pavia, 82 N.Y.2d at 452;

Hartford Accident and Indem. Co. v. Michigan Mut. Ins. Co., 61 N.Y.2d 569, 574 (1984),

---

refusal to settle which is rooted in a breach of the direct duty of good faith owed by a primary carrier to an
excess carrier, see Hartford Accident and Indem. Co. v. Michigan Mut. Ins. Co., 61 N.Y.2d 569, 574 (1984),
affirming, 93 A.D.2d 337 (1st Dept. 1983).

affirming, 93 A.D.2d 337 (1st Dept. 1983).  While California does not recognize a direct duty owed by a primary carrier to an excess carrier, it employs equitable subrogation to impose a duty on primary carriers to act in good faith in regard to excess carriers that is "identical to that owed to its insured." Diamond Heights Homeowners Ass'n v. Nat'l Am. Ins. Co., 227 Cal. Rptr. 906, 915 (1st Dist. 1991)(citing Signal Companies, Inc. v. Harbor Ins. Co., 612 P.2d 889, 893 (Cal. 1980).

In order to demonstrate that an insurer has breached the duty of good faith, and concomitantly acted in bad faith, New York requires a plaintiff to prove that the insurer acted with "gross disregard" of its insured's interests or the excess carrier's interests. Pavia, 82 N.Y.2d 453-54.  Gross disregard requires "a pattern of behavior evincing a conscious or knowing indifference to the probability that an insured would be held personally accountable for a large judgment if a settlement offer within the policy limits were not accepted." Id.  The insurer's conduct must have involved a "'deliberate or reckless failure to place on equal footing the interests of its insured with its own interests when considering a settlement offer.'" Pinto, 221 F.3d at 399 (quoting Pavia, 82 N.Y.2d at 453).  An insurer who acts negligently or makes an error in judgment has not acted in bad faith. Pavia, 82 N.Y.2d 445.

The determination of whether an insurer has acted in bad faith is highly case specific and "[n]o pat formula applies to the wide variety of fact patterns that occur, or readily resolves whether an insurer acted in good faith." Pinto, 221 F.3d at 399.  Rather, the New York Court of Appeals employs a flexible standard and a factfinder may consider "factors such as the plaintiff's likelihood of success on the issue of liability, the potential damages award, the financial burden on each party if the insurer refuses to settle . . . the information available to the insurer when the demand for settlement was made, and any other relevant proof tending to establish or negate the insurer's good faith in refusing to settle." New

England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co., 295 F.3d 232, 241-42 (2d Cir. 2002) (citing Pavia, 82 N.Y.2d at 454-55).

Twin City contends that if New York's gross disregard standard is found to govern the cross-claim, as I have concluded it does, then Twin City is entitled to an amendment or alteration of the judgment in its favor. The jury was presented with two distinct questions on the verdict form. The first asked whether the Excess Carriers had demonstrated that Twin City had acted in bad faith, as defined in the Court's instructions. Those instructions encompassed elements common to both California and New York law. If the jury concluded that Twin City had acted in bad faith (as they did), then they were required to then determine whether Twin City had acted with gross disregard of the Excess Carriers' interests as defined in the Court's instructions which were framed in accordance with New York law. Because the jury found that Twin City had not acted with gross disregard of the Excess Carriers' interests, Twin City is entitled to alteration of the judgment under Rule 59(e) to prevent both legal error and manifest injustice.

Because I have concluded that Twin City is entitled to an alteration of the judgment, I do not consider Twin City's motion for judgment as a matter of law or a new trial. Further, the grant of Twin City's motion renders Liberty and North American's motions for interest and attorney's fees in conjunction with the bad faith claim moot as judgment is to be entered in favor of Twin City.

V.   CONCLUSION

Liberty and North American's motions pursuant to Rules 50 and 59, Fed. R. Civ. P., are DENIED. Plaintiff's motion to amend the judgment to include pre-judgment interest pursuant to Rule 59(e), Fed. R. Civ. P. is GRANTED. Twin City's motion to amend the judgment pursuant to Rule 59(e), Fed. R. Civ. P. is GRANTED. The Clerk is directed to

enter judgment in favor of Twin City on the bad faith cross claim.  The Clerk is directed to amend the judgment in favor of plaintiff on the breach of contract claim against Liberty to include $716,500 in pre-judgment interest and against North American in the amount of $585,484.12.  All other relief sought by any party is DENIED.

         SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       May 30, 2007